There are two issues presented in this case, one directly involving the honesty of the defendant, a brother of the plaintiffs, and the other indirectly impugning his integrity as he is asked to collate a certain sum of money by reason of the fact that he gained an advantage over his co-heirs in the estate of his father by the purchase of certain shares of bank stock which he bought from his father a few years before he died. In the first issue the plaintiffs seek to have the court cancel and declare null and void an act of mortgage executed in his favor by his father on the ground that it was a fraudulent simulation designed to give him an advantage over his co-heirs and deprive them of a part of their inheritance.
The father, Gustave Berthelote, an elderly gentleman, died on May 11, 1944. The mortgage which is attacked was executed *Page 192 
September 12, 1942, over two years and a half before his death. It appears to be a mortgage given to represent an indebtedness incurred by the father on that day, in the sum of $800 and is secured by a first mortgage on the old gentleman's home property which constituted about fifty per cent of the estate he left. It is attacked on the ground that it was a simulation pure and simple and that no consideration whatever passed as the father, who was an aged gentleman who lived very frugally, had no reason to borrow any such sum of money as he had all that he needed and was not contemplating and in fact did not make any investments from that time until his death. The defense to the act of mortgage is that it was valid and represented a loan made by the defendant to his father to whom he gave the $800 in cash and that he believed that his father used the whole or part of the funds to satisfy the complaints that were being made by some of his children in settlements of the different communities in which he was involved, he having had children by three different marriages.
The testimony is rather voluminous, and after all there is not much variance or contradiction to be found except on the direct point that the old gentleman either received the $800 which the defendant says he loaned him on the mortgage note or that he did not. To resolve the question one way or the other it is necessary therefore to consider a lot more or less relevant facts and circumstances. The district judge did that and ruled in favor of the plaintiffs. In fact, he seemed to have entertained no doubt that nearly all the circumstances raised so much suspicion against the defendant there was hardly any question but that the taking of this mortgage was a scheme on his part to try to defraud his co-heirs and obtain an undue advantage over them.
[1] Our reaction to the record is that the district judge was correct in the conclusion he reached but we do not find it necessary to go as far as he did in accepting all of the circumstances he mentioned, as proof.
To us, the suspicious part about the transaction arises out of the question why would this old gentleman have borrowed $800 at the time, and mortgaged his property as security. The testimony is overwhelming that he owed nobody anything, that he had all of his needs and wants at home, that he had settled with all of his children, giving them all that was coming to them and, in some cases, favoring some beyond what was due them, so there was no reason shown why he should have wanted to borrow anything at all, much less the sum of $800. The question of the son's ability to have loaned him the $800 does not enter into the solution of the problem. His ability to loan the money is not disputed, but after all it has nothing to do with the case. It is doubtful whether he was called upon to say what the old gentleman did or wanted to do with the money. He undertook in his answer to say that he believed it was to make settlements with his children but unfortunately for him that is totally disproved. If, on the other hand, the burden was on the children to show that their father never did receive the money claimed to have been loaned it is our opinion that the various facts and circumstances found in the record show that he did not.
On the very day that he is supposed to have borrowed the $800 the father is shown to have had a balance of $1,600 in his checking account in the Bank of Terrebonne Trust Company, at Houma, for which he seemed to have no pressing needs at the time. The bank statement shows positively that he did not deposit anything on the day that the mortgage was executed and there is no proof to show that at that time he placed this money in safety either in the safe which he had at his home, or in any other place, or that he gave or disposed of any of it in any other manner. He was at the time well advanced in age, was sickly and required the services of a physician regularly. One of his daughters and her husband who lived with him seemed to have taken good care of him, shared the household expenses and proof was made that they lived on a cash basis. The doctor who attended him testified that he paid him in cash regularly and that he knew him to be a man who hated to have any debts pending.
It is rather significant that on the same day this act of mortgage was executed the old gentleman also executed a will before the same notary in which the defendant was appointed executor of his estate. The will makes no other disposition of his property than what the law would have made and apparently it was drawn for the single purpose of having this appointment in favor of the defendant. The will and *Page 193 
a copy of the act of mortgage were placed for safekeeping in the old gentleman's bank box at the bank in Houma and it appears a bit singular that despite the fact that he had this daughter living with him and handling all of his business affairs, having general power to even sign his checks, and being the only one besides him who knew the combination of the safe he kept at his home, he never told her, or anyone else, a word about having executed that act of mortgage or of having made a will. It is rather significant also that the defendant himself would not have mentioned it to some of his brothers and sisters especially at the time of his father's death. He even let some of them open the succession before informing them that his father had made a will in which he had been appointed executor of the estate. That, to say the least, was rather strange conduct on his part, and with other circumstances already noted helped to cast a serious doubt on the validity of the whole transaction.
It is observed that neither the notary before whom the act of mortgage was executed nor either of the witnesses to the same testified in the case. It may be that they knew nothing more than the fact that the act had been executed. But when we come to consider the defendant's own testimony in one instance at least, that he gave his father the money at the time the act was passed, it is likely that one of these three persons would have seen that and been in a position to say that something like that had taken place even though in another instance the defendant claims that the money was inclosed in a large envelope when it was handed to his father.
The most striking thing about the whole case, however, is the fact that this old gentleman seemed to have had absolutely no reason in the world to borrow this money and, least of all, to place a mortgage on his property, a thing which he appeared to have been proud of never having had to do. When all of this is considered in connection with the fact that it was on the same day the act of mortgage was passed that the will was executed in which the defendant was named the executor and that both the mortgage and the will were kept so secretly from his brothers and sisters for more than two years we are left with the impression that the defendant must have exerted some undue influence over his aging and ailing father causing him to do these things from which naturally he expected to obtain an advantage over his coheirs in the estate which they were to inherit.
[2] It is particularly on questions of fact of this nature that an appellate court should give great weight to the findings of the trial judge and should not reverse him unless he is shown to have manifestly erred. Guided by this rule, we fail to find manifest error on this point in the judgment appealed from and find no reason to disturb it.
[3] With regard to the demand for collation we note that the district judge concluded that the value of the bank stock which the defendant bought from his father was $150 per share instead of $100, the price at which the sale was made. Defendant contended that he actually paid $122 per share as at the time of the sale it was agreed between him and his father that the latter was to receive, in addition to the $100 per share, whatever dividends the stock would yield for the two succeeding years, and as these amounted to $22 per share, that amount became part of the purchase price he paid for the stock.
The district judge did not agree with this contention but held that as the defendant had sold stock which he owned in certain homestead associations in New Orleans in order to realize the $1,600 with which to pay for the bank stock and had sacrificed two years' dividends at the rate of four per cent on the homestead stock, amounting to the sum of $128, he should be given credit for that amount on the total purchase price of the bank stock. Following that reasoning, he ordered collation in the sum of $800 which was at the rate of $50 per share for the sixteen shares of stock less the sum of $128, leaving a balance of $672 which the defendant had to collate. Plaintiffs have answered the appeal on the point of collation maintaining that the actual value of the bank stock was $175 per share and, compared to the price of $100, collation should be ordered at the rate of $75 per share or in the total sum of $1,200. In brief filed on their behalf it is stated that even on the basis of these figures and applying the reasoning of the district judge in crediting the defendant with the dividends on the homestead stock, the amount would be $1,072.
We do not understand on what ground the district judge allowed the defendant credit for two years' dividends on the *Page 194 
homestead stock which he sold in order to realize the money with which to pay for the bank stock. If the transaction had involved an exchange of one stock for the other there might have been a reason for making this allowance, but as far as the record discloses the sale of the bank stock had no connection whatever with the sale by the defendant of his homestead stock other than that he had to find $1,600 cash with which to pay for the bank stock and this he obtained by the sale of the homestead stock. On the other hand, there was an explicit agreement between them that in addition to the $100 per share which he paid him, his father would receive whatever dividends the bank would pay on the stock for two years following the sale, and as these amounted to the sum of $22 per share we conclude that he paid his father at the rate of $122 per share for the sixteen shares of bank stock.
It now remains for us to decide what was the actual value of the bank stock at the time of the sale in order to determine whether the difference between that value, and the price paid for it by the defendant was great enough to enforce collation, for under article 1248 of the Revised Civil Code it is provided that "the advantage which a father bestows upon his son, though in any other manner than by donation or legacy, is likewise subject to collation." As illustrative, among other examples, the article then goes on to state: "Thus, when a father has sold a thing to his son at a very low price, * * * that is subject to collation."
There is no doubt that the stock in question was very desirable bank stock, and at the time had a book value largely in excess of its par value of $100 per share, all as testified to by the vice president and cashier of the bank, Mr. Hayes Whitney. But Mr. Whitney himself readily conceded that the book value of bank stock was not its actual value as the value of any bank stock may fluctuate from day to day. Our idea is that the fairest actual value of stock of this kind can best be determined from the average price it brings in other sales at about the time the particular transaction we are concerned with takes place. Unfortunately there was only a single sale of the same bank stock during the year of the sale in the present instance and it involved only a few shares. However, it appeared to have been a bona fide sale at the price of $150 per share. That was the value placed on it by the district judge for the purpose of deciding the question of collation and in this we agree with him.
The difference between the actual value of $150 and the price paid by the defendant, $122 is therefore $28 per share and, as already stated, the question is whether on that difference the defendant received such an advantage in the sale as to make it subject to collation. When we consider that the price he paid was a bit over eighty per cent of the actual value of the stock, as we have found it, it would hardly seem reasonable to say that it was sold "at a very low price", the condition noted in the article of the Code in citing examples of transactions that can be made subject to collation. These words have a plain and ordinary meaning and we believe that it would strain that meaning to hold that the sale of an article at eighty per cent of its value would be "at a very low price." In some instances that may perhaps be considered a low price but in none that we can think of could it reasonably be said to be a very low
price.
There is another article of the Civil Code which may be said to be somewhat analogous to the one now under discussion. That is article 2444 which has reference to sales of immovable property made by parents to their children which may be attacked by forced heirs as containing a donation in disguise. In that article the Code fixes the price at which such a sale can be attacked as one that is "below one-fourth of the real value of the immovable sold, at the time of the sale." As stated, this article has application to the sales of immovables, but it at least gives us a definite idea of a price that may be considered insufficient enough to support an attack on the sale.
The principle which underlies this article as well as article 1248 is that equality among heirs which the civil law always strives to maintain, and it serves as a basis on which we may construe what is meant by article 1248 which provides for collation in a sale of a thing by a father to his son "at a very low price." If the idea conveyed in article 2444 that it is a price which is below one-fourth of the real value of the immovable that is sold which makes the sale subject to attack, it would hardly seem fair to force collation by an heir who, like the defendant in this case, paid eighty per cent of the actual value of the thing he bought. In this respect, *Page 195 
therefore, we find the judgment appealed from erroneous and it will have to be reversed.
In his answer the defendant had presented a reconventional demand against some of the plaintiffs claiming that they had received some advantages in settlements made with them by their father and they should also be made to collate. The proof he offered, however, was by no means sufficient to support his demands and they were properly rejected by the district judge.
For the reasons herein stated it is ordered that the judgment appealed from, in so far as it ordered the defendant to collate the sum of $672 in his father's succession, be and it is hereby reversed, set aside and annulled, and in other respects it is affirmed.
It is further ordered that all costs incurred in the lower court be paid in the proportion of one half by the plaintiffs and the other half by the defendant; costs of this appeal to be paid by the plaintiffs, appellees herein.